KARIN J. IMMERGUT, OSB #96314
United States Attorney
District of Oregon
WILLIAM E. FITZGERALD, OSB #91515
Assistant United States Attorney
701 High Street
Eugene, Oregon 97401
(541) 465-6771
bud.fitzgerald@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 05-60053-03-HO |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| v. | ) | |
| | ) | |
| JACOB ALBERT LASKEY, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through Karin J. Immergut, United States
Attorney for the District of Oregon, William E. Fitzgerald, Assistant United States
Attorney and Criminal Section Attorney Roy Conn of the United States Department of
Justice Civil Rights Division, hereby submits its Sentencing Memorandum in the above-
captioned case.

PAGE 1 - GOVERNMENT'S SENTENCING MEMORANDUM

Sentencing in this matter is set for March 20, 2007, at 10:45 a.m., in Eugene,

## I.  BACKGROUND

On August 15, 2006, Defendant Laskey pled guilty to Counts 1, 2, 3, 5, 6, 9 and 10 of the Second Superseding Indictment.  The court accepted Defendant Laskey's guilty plea under Rule 11(c)(1)(B) and ordered a pre-sentence investigation report.  The Government agreed to dismiss all remaining counts at time of sentencing.

### A.  Counts of Conviction

Count 1 charges beginning in or about October 2002, in the District of Oregon, Jacob Albert Laskey, Gabriel Doyle Laskey and Gerald Anthony Poundstone, who were self-avowed white supremacists who advocated the supremacy of white people over other races, separation of the races, and the oppression of Jewish, African American, and other ethnic and racial groups, willfully conspired and agreed with one another and others to injure, oppress, threaten, and intimidate Jewish persons in the free exercise and enjoyment of the rights secured to them by the Constitution and laws of the United States to use, hold and occupy real property in the same manner as is enjoyed by all citizens, without discrimination on account of race, in violation of 18 U.S.C. § 241.

Count 2 charges on or about October 25, 2002, in the District of Oregon, Jacob Albert Laskey, Gabriel Doyle Laskey, Gerald Anthony Poundstone and other persons known and unknown to the Grand Jury, intentionally defaced and damaged, and did attempt to deface and damage religious real property because of the ethnic characteristics

PAGE 2 - GOVERNMENT'S SENTENCING MEMORANDUM

of individuals associated with that religious property, by throwing rocks engraved with Nazi swastikas and breaking windows of Temple Beth Israel, located at 2550 Portland Street, Eugene, Oregon, in violation of 18 U.S.C. § 247(c).

Count 3 charges on or about July 21 and 22, 2004, in the District of Oregon, Jacob Albert Laskey did knowingly intimidate, threaten, and corruptly persuade and did attempt to intimidate, threaten, and corruptly persuade another person, A.M., with intent to influence, delay, and prevent the testimony of A.M. in an official proceeding, to wit, a federal grand jury investigating violations of federal civil rights laws, in violation of 18 U.S.C. § 1512(b)(1).

Count 5 charges in or about the latter part of 2004 and the early part of 2005, in the District of Oregon, Jacob Albert Laskey did knowingly use intimidation and threats, and did attempt to use intimidation and threats, with intent to hinder, delay, and prevent the communication, by a witness, J.B., to a federal law enforcement officer, of information relating to the commission or possible commission of a federal offense, to-wit, conspiracy against rights of citizens, as set forth in Title 18, United States Code, Section 241, in violation of Title 18 U.S.C. § 1512(b)(3).

Count 6 charges on or about April 17, 2005, in the District of Oregon, Jacob Albert Laskey, with intent that another person, Jesse Baker, engage in conduct constituting a felony that has as an element the threatened use of physical force against a person, in violation of the laws of the United States, including Title 18, United States Code, Sections

PAGE 3 - GOVERNMENT'S SENTENCING MEMORANDUM

1512(a)(1)(A) and 1512(a)(2)(A), and under circumstances strongly corroborative of that intent, did solicit and otherwise endeavor to persuade Jesse Baker to engage in such conduct, that is, to  kill, and attempt to kill, a person, A.M., and otherwise use physical force and the threat of physical force against A.M., and attempt to do so, to prevent the attendance and testimony of A.M. in an official proceeding, to-wit, a grand jury investigation and trial of Jacob Laskey for violations of the federal civil rights laws and other federal crimes, in violation of Title 18, United States Code, Section 373.

Count 9 charges on or about April 17, 2005, in the District of Oregon, Jacob Albert Laskey, with intent that another person, Jesse Baker, engage in conduct constituting a felony that has as an element the threatened use of physical force against a person, in violation of the laws of the United States, including Title 18 U.S.C. § 1512(c)(2) and Title 18 U.S.C. § 2332a(a)(3), and under circumstances strongly corroborative of that intent, did solicit and otherwise endeavor to persuade Jesse Baker to engage in such conduct, that is, to corruptly obstruct, influence, and impede an official proceeding, to-wit, a federal grand jury investigation into federal civil rights violations and other federal crimes by Jacob Laskey, and attempt to do so, by requesting Jesse Baker to telephonically communicate information to occupants of a federal building in Eugene, Oregon, where the grand jury conducted its investigations, that a bomb was about to be exploded, in violation of Title 18, United States Code, Section 373.

Count 10 charges beginning on a date unknown and continuing until in or about

PAGE 4 - GOVERNMENT'S SENTENCING MEMORANDUM

April 6, 2005, in Springfield, Oregon, and elsewhere in the District of Oregon, Jacob Albert Laskey, having been convicted of the following felony crime punishable by imprisonment for a term exceeding one year, to-wit:

Assault in the Third Degree in the Circuit Court of the State of Oregon for Lane County, Case No. 20-02-26294-B, on or about March 13, 2003; did knowingly possess the following firearm and ammunition, to-wit:

1.    Colt .45 caliber black semiautomatic pistol, bearing Serial No. 37732B70;

2.    multiple .45 caliber bullet cartridges; and

3.    box of 7.62 mm ammunition;

which firearm and ammunition had been shipped or transported in interstate and foreign commerce, in violation of Title 18 U.S.C. Section 922(g)(1).

**B.  Maximum Punishments**

The Federal Criminal Code authorizes the following maximum sentences:

Count 1, Conspiracy Against Rights of Citizens, 18 U.S.C. § 241, Class C felony, 10 years imprisonment, $250,000 fine, 3 years of supervised release and a $100 special assessment.

Count 2, Damage to Religious Property, 18 U.S.C. § 247(c), Class C felony, 20 years imprisonment, $250,000 fine, 3 years of supervised release and a $100 special assessment.

Counts 3 and 5, Obstruction of Justice, 18 U.S.C. § 1512(b)(1), Class C felony, 10

PAGE 5 - GOVERNMENT'S SENTENCING MEMORANDUM

years imprisonment, $250,000 fine, 3 years of supervised release and a $100 special assessment.

Count 6, Soliciting A Crime of Violence, Class C felony, 20 years imprisonment, $250,000 fine, 3 years of supervised release and a $100 special assessment.

Count 9, Soliciting A Crime of Violence, Class D felony, 5 years imprisonment, a fine of $250,000, at least 3 years of supervised release, and a $100 special assessment.

Count 10, Felon in Possession of A Firearm, Class C felony, 10 years imprisonment, $250,000 fine, 3 years of supervised release and a $100 special assessment.

## II. FACTS

### A. Stipulation:

In his plea agreement, Defendant Jacob Albert Laskey entered into the following stipulation of facts:

On October 25, 2002, Jacob Laskey accompanied his brother Gabriel Laskey, Gerald Poundstone, Jesse Baker and other persons known and unknown to the Grand Jury, in a vehicle driven by Jacob Laskey, to Temple Beth Israel in Eugene, Oregon. Jacob Laskey, Gerald Poundstone and Gabriel Laskey were white supremacists who advocated, among other things, the supremacy of white people over other races, separation of the races, and the oppression of Jewish, African American, and other ethnic and racial groups. Jacob Laskey admits that he willfully conspired with Jacob Laskey, Gabriel Laskey, Jesse Baker and Jereomy Baker to intimidate Jewish persons at the Temple Beth Israel by throwing

PAGE 6 - GOVERNMENT'S SENTENCING MEMORANDUM

rocks at the temple.  Before the rocks were thrown, Jacob Laskey and his co-conspirators agreed to engrave the rocks with Nazi swastikas.   Jacob Laskey and each of his co-conspirators then willfully and intentionally threw swastika-etched rocks at the temple, at a time when there were people inside the temple, and shattered two of the temple's windows.

Jacob Laskey admits that by throwing these rocks, he and his co-conspirators violated the victims' rights to use, hold, and occupy real property free from discrimination on account of race.  After throwing the rocks, Laskey and his coconspirators ran back to his vehicle and together they fled the scene.

Defendant admits that following the attack upon the synagogue he sought to obstruct justice regarding the investigation of the October 25, 2002 offense against the Temple in several ways.   Defendant admits that he knew his girlfriend, A.M., was a witness concerning the attack upon the Temple.  Defendant admits that, in July 2004, he corruptly persuaded, or attempted to corruptly persuade, A. M. to go into hiding and to leave the jurisdiction so that she could not be subpoenaed and compelled to testify before the federal grand jury that investigated this case.  Defendant also admits that he corruptly persuaded, or attempted to corruptly persuade, A.M. to not be truthful about what she knew if she was compelled to testify before the grand jury.  In further effort to prevent A.M. from testifying against him, he attempted to persuade her to marry him with the  hope that this would create a valid marital privilege.

PAGE 7 - GOVERNMENT'S SENTENCING MEMORANDUM

Jacob Laskey also admits that he obstructed justice, or attempted to do so, by intimidating and threatening, or attempting to intimidate and threaten, physical harm against co-conspirator Jesse Baker, in or about the latter part of 2004 and the early part of 2005, in order to prevent Jesse Baker from communicating information related to defendant's commission of a federal offense to agents of the FBI.   Laskey told Baker he knew Baker was going to testify regarding this matter and warned him, "You know what happens to snitches" and "Anybody that's a rat gets taken care of."  On another occasion, coconspirator Gerald Poundstone told Baker, shortly after Baker was initially contacted by the case agent in this matter, that "anyone who opens his mouth better watch his ass."

Defendant admits that on or about April 17, 2005, he sought to obstruct justice in this matter by soliciting Jesse Baker (at a time when he felt Jesse Baker was no longer a threat to testify against him) to kill A.M. and other potential witnesses named in Counts Seven and Eight of the Second Superseding Indictment.  Defendant admits that during the same conversation he sought to obstruct justice, which resulted in the charge contained in count 9, by soliciting Jesse Baker to telephonically call in a bomb threat to the Federal Court House in Eugene, Oregon, in order to impede the grand jury's ability to meet and determine whether to issue an indictment in this case.  Defendant admits that when he made these solicitations he seriously intended that Jesse Baker carry out these requests.

Defendant admits that his criminal record includes two felony convictions: Assault in the Third Degree (Circuit Court of Oregon, Lane County, sentenced March 13, 2003)

and Battery Evincing Racial Prejudice (Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, sentenced August 16, 2001). Defendant admits that, beginning at least from the spring of 2004 and continuing until on or about April 6, 2005, while convicted of the felony offenses noted above, he possessed the firearm specified in the indictment, to wit: a .45 caliber semi-automatic handgun bearing serial number 37732B70 and 7.62 ammunition and .45 caliber bullet cartridges. Defendant admits that this firearm and ammunition have been transported or shipped in interstate or foreign commerce.

**B.     Tape Recorded  Evidence:**

Evidence captured on tape in a consentually recorded conversation between Defendant Laskey and co-conspirator Jesse Baker supports Laskey's guilty plea to counts 6 and 9 in this matter. This tape clearly shows that Defendant Laskey intended Jesse Baker to kill three potential witnesses against Laskey and Baker.

Defendant Laskey first solicited Jesse Baker to kill K.P., a person he believed to be a potential witness against them regarding the attack upon the synagogue. Defendant Laskey provided Jesse Baker with the location of K.P.'s residence and directions for finding her. Next, Defendant Laskey solicited Baker to kill A.M., and promised to contact Baker later to provide information on how to locate her. Defendant Laskey then began persuading Baker that D.D. (Baker's former girlfriend) was out to get him and had "blabbed something" to the authorities about Baker that could get Baker put away. Defendant Laskey warned Baker of the potential detriment to Baker if he did not take

PAGE 9 - GOVERNMENT'S SENTENCING MEMORANDUM

action to eliminate the threat of D.D. becoming a witness against him.  When Baker asked Defendant Laskey what he wanted Baker to do about A.M. and noted that he knew Laskey still loved A.M., Defendant Laskey responded, "No I don't, she's done." Baker then asked, "Well, then what do you want me to do?" Laskey stated, "She's fuckin HIV infected dude. Whack her." Baker responded, "Oh, yeah, she's already done."

The context in which the term "whack" was used indicates that Defendant Laskey seriously meant for Jesse Baker to kill A.M.  By using the term "whack" immediately following the allegation that Amanda was "HIV infected", clearly conveyed the idea that Defendant Laskey was talking about A.M.'s death, not a possible assault to frighten or intimidate her.  Laskey and Baker also confirmed that they were both talking about A.M.'s death by stating that she was "done." Baker's response, "she's already done" indicates that he understood A.M.'s killing would be less significant than the others because the HIV infection would result in her death in any event.  The FBI confirmed through A.M. that the HIV allegation by Laskey was false.  Apparently, Defendant Laskey told Baker this HIV story to convince Baker that he (Laskey) really did not love A.M. any more, and that Baker should go ahead and kill her because she was going to die soon anyway.  Again, this corroborates the serious nature of Defendant Laskey's intent.

Once outside of Defendant Laskey's parents' house (where the FBI had executed a search warrant months earlier), Defendant Laskey felt more confident that the conversation between he and Baker could not be recorded, the following recorded conversation took

place which leaves no doubt that Defendant Laskey intended that all three witnesses be killed.

Baker:  Yea, they can't have the fucking outside wired.  So, I know you don't really give a fuck about Krystin, but [Deanna and Amanda]."

Laskey:  All of them.

Baker:  All of them? You want them all taken care of?

Laskey:  It's no joke dude.

Baker:  I know its no joke dude, Jake, believe me.  This is  my life they're fucking with too.

        ....................................

Laskey:  Yea.  That's the way the scenario is.  I get out [of jail] in thirty days dude, it's got to be over with by then.

Baker:  So you want me to do all of them before what?

April what?

Laskey:  I get out May 24.


        Laskey's repeated solicitation of the killings (once inside the house and once outside the house), Laskey's expressed seriousness about the commission of the crimes by specifically telling Baker, "It's no joke", Laskey's providing and promising to provide, information related to the location of two of the intended victims (K.P. and A.M.),

Laskey's setting of a deadline (before his release from jail–5/24/05) by which the killings had to be done, Laskey's warning to Baker of potential adverse consequences to himself if he did not commit the crimes, by emphasizing D.D.'s hatred toward him stating, "She found a reason to get you in trouble, she fucking blabbed something, she hates you", and the direct benefit that killing the witnesses would bring to Baker and Laskey, by enabling them to avoid prosecution and a prison sentence for the Temple Beth Israel offense, are all circumstances that are strongly corroborative of Laskey's intent.

The evidence against Defendant Laskey that supports his plea to count 9 for soliciting Jesse Baker to obstruct or impede the grand jury's investigation into Laskey's commission of federal civil rights violations, by telling Jesse Baker to communicate, by telephone, a bomb threat to occupants of the federal courthouse, on the day the grand jury was scheduled to resume investigating this matter was also captured on tape during the April 17, 2005 conversation between Jesse Baker and Defendant Laskey.

Laskey's solicitation of this offense was made under circumstances strongly corroborative of his intent to have Jesse Baker commit the crime solicited.  First, Defendant Laskey's request for Baker to phone in the bomb threat came immediately upon the heels of Laskey's solicitation of  Baker to murder three witnesses in this case.  Second, Defendant Laskey solicited Baker to call in a bomb threat in an effort to ensure that the grand jury would not be able to convene and indict him before he could be released from jail; information gathered by the FBI revealed that Defendant Laskey

PAGE 12 - GOVERNMENT'S SENTENCING MEMORANDUM

was planning to flee the country once he was released.  Third, Defendant Laskey suggested that Baker could use a disposable cell phone, which could not be traced, to make the bomb threat and to issue the threat in the name of "Allah" to make people believe that the threat was being made by real terrorists.  Finally, Defendant Laskey told Baker that he could find out the next date the grand jury was scheduled to meet by checking the dates placed on the witnesses' subpoenas.  Thus, all these circumstances are strongly corroborative of Laskey's serious intent to have Baker commit the crime being solicited.

### C.    Post-Guilty Plea Conduct

July 12, 2006 -- A prison officer at the Federal Detention Center, Sheridan, Oregon, reported that on June 26, 2006, Laskey had made a threatening statement after missing a scheduled lock down.  The officer had advised Laskey that any future missed lock downs would have to be reported and that Laskey would likely lose his food service assignment.  Laskey replied, "I'll talk to the counselor about that.  You need to quit pissing us off and playing fucking mind games with us or something is going to happen to you and you won't know who is going to do it or where it will come from. So just leave us alone and let us run the unit and you just turn keys and collect your little fucking paycheck."

January 10, 2007 -- Prison officials at the Federal Detention Center, Sheridan, Oregon, intercepted a four-page typed document which had apparently  been prepared

by Laskey. The document, dated December 27, 2006, includes a one-page cover letter addressed to Erich Gliebe, National Alliance Chairman and Editor of Resistance Magazine, and a three-page article which Laskey asks Gliebe to publish in Resistance Magazine.

In the article, Laskey encourages prospective readers to organize into Al Qaeda and Irish Republican Army type "cells" and carry out bombings in the United States and "break into homes at early dawn to kill targets in front of wives and children, political officials coming or going to work, or on lonely roads and fields." Laskey proposes that cells adopt a "shoot and scoot" policy targeting public officials, politicians, media spokesmen and the like. Laskey's signature on the cover letter matches other known signatures, he had motive and opportunity and there is little doubt that he authored the document.

### III.   <u>BOOKER REQUIREMENTS</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. §

PAGE 14 - GOVERNMENT'S SENTENCING MEMORANDUM

3553(b)(1), thus declaring the Guidelines "effectively advisory." <u>Booker</u>, 543 U.S. at 245. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be reviewed by the Court of Appeals for "unreasonableness." <u>Id.</u> at 264.

In the wake of <u>Booker</u>, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Id.</u> at 264.

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

In this case, as explained further below, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Moreover, the parties agree that a Guidelines calculated sentence is appropriate in this case. Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range established by the following analysis.

PAGE 15 - GOVERNMENT'S SENTENCING MEMORANDUM

## IV.  ADVISORY SENTENCING GUIDELINES CALCULATION

### A.    Base Offense Level

The parties generally agree with Probation's calculation of the advisory guideline range.[1] Counts 1 and 2 will be grouped together, pursuant to U.S.S.G. § 3D1.2(a), because the charged conduct involved the same victim and acts.  Counts 3, 5, 6 and 9 will be grouped with counts 1 and 2 and each other, pursuant to U.S.S.G. § 3D1.2(c), because they embody conduct that is treated as an adjustment to the guideline applicable to counts 1 and 2.  Count 10 will not be grouped with the other counts because it does not involve the same victim or act or transaction.  Since count 6 provides the highest offense level of all the offenses charged in this case, it should be used to determine the appropriate sentencing guideline range.

As stated in the pre-sentence report, Defendant's  base offense level is 33, pursuant to U.S.S.G. § 2A1.5 (Solicitation to Commit Murder), and the statutory maximum for this offense is 20 years imprisonment. There are no specific offense characteristics that apply to this offense under § 2A1.5.

### B.    Acceptance of Responsibility

District courts have broad discretion to grant or deny the reduction for acceptance of responsibility. See USSG §3E1.1, comment. (n.5). It is most

---

[1]The Government reserves the right to oppose  acceptance of responsibility.

PAGE 16 - GOVERNMENT'S SENTENCING MEMORANDUM

frequently denied for failure to cooperate with authorities or simply a failure, in the sentencing court's view, to accept responsibility for the criminal conduct.

The Ninth Circuit has held that "a sentencing court cannot consider against a defendant any constitutionally protected conduct." The court reversed a denial that was based on defendant's failure to voluntarily surrender to authorities or assist in the recovery of the "fruits and instrumentalities of the offense," factors that are listed in the commentary to §3E1.1 as to be used in "determining whether a defendant qualifies for this provision." U.S. v. Watt, 910 F.2d 587, 590-93 (9th Cir. 1990). See also U.S. v. La Pierre, 998 F.2d 1460, 1467-68 (9th Cir. 1993) (remanded: may not deny reduction because defendant refused to discuss facts with probation officer and planned to appeal where defendant otherwise accepted responsibility). But cf. U.S. v. Wells, 154 F.3d 412, 413-14 (7th Cir. 1998) (reduction may be denied for defendant's refusal to disclose whereabouts of almost $700,000 from robbery).

To the extent Defendant's post-conviction conduct, as set forth above, may or may not be constitutionally protected, the Government reserves the right to argue against acceptance of responsibility at sentencing. If the Government ultimately decides that the acceptance of responsibility reduction is inappropriate, it will provide supporting authority in a supplemental sentencing memorandum.

**C.     Criminal History Category**

PAGE 17 - GOVERNMENT'S SENTENCING MEMORANDUM

The U.S. Probation Office has correctly calculated Defendant Laskey's criminal history status as a category IV and his total offense level as 30 (after deducting 3 levels for acceptance). The Defendant has not filed any objections contesting this determination. Offense level 30 and criminal history category IV results in a sentencing range of 135 to 268 months. Probation has recommended a 135 month prison sentence.

Paragraph 9 of the plea agreement states, "The parties agree that Count Six of the indictment is the highest and controlling offense Guideline in this matter. The parties further agree, based upon USSG calculations, that the defendant's total offense level is 33 and his criminal history category is III. The parties agree that the appropriate sentencing range in this matter for the defendant's offense conduct, after deducting three levels for acceptance, is 121 to 151 months. The parties recommend the low end of this applicable guideline range." This estimate was based on the best information available to the government at that time and was made in good faith. However, this estimation of Defendant Laskey's criminal history falling under category III of the Guidelines was in error.

At the time the government entered the plea agreement in this matter, it believed Defendant Laskey had only two convictions: 1) Battery Evincing Racial Prejudice (felony) and 2) Assault III (felony). A consideration of these two convictions under the Guidelines in conjunction with the offenses committed in this

case results in  6 criminal history points -- criminal history category III.

The government was unaware of the defendant's conviction for Interfering With a Peace Officer (misdemeanor).  Information obtained by the FBI indicated only that Defendant Laskey had been arrested for this offense on October 31, 2002, but did not indicate that he had actually been convicted.  Thus, this conviction was not considered  in the parties' estimation of Defendant Laskey's criminal history category in the plea agreement.  The parties admit mistake.

The pre-sentence report correctly states that Defendant Laskey was convicted in Lane County Court of Interfering With a Peace Officer on August 12, 2003, and sentenced to 90 days in jail, followed by 2 years of probation.  The local court revoked Defendant Laskey's probation on April 26, 2004 and imposed a six month jail sentence.  Subsequently, on April 17, 2005, Defendant Laskey committed the offense charged in Count 6 of the indictment in this case (Solicitation to Commit Murder) less than two years following his release from custody for the sentenced imposed on April 26, 2004.  Thus, Defendant Laskey's conviction for Interfering With a Peace Officer, as calculated by the probation writer, adds 3 points to Defendant Laskey's criminal history score, increasing it from 6 to 9 -- criminal history category IV.

The Ninth Circuit has held that neither the government nor a defendant may have the court rescind a plea agreement where there has been a "mutual mistake of

law" by the parties.  See  United States v. Transfiguracion, 442 F.3d 1222, 1229

(9th Cir. 2006) (terms of plea agreement held enforceable despite defendant's plea

to an offense that the Ninth Circuit subsequently  determined was no longer a law

violation).  See also United States v. Zweber, 913 F.2d 705, 711 (9th Cir. 1990)

(defendants not entitled to withdraw their pleas because they and the government

erroneously believed a sentencing reduction would be legally appropriate).  Thus, as

supported by the cases cited above, whether the parties to a plea agreement  commit

a mistake, based in fact or law, or unilateral or mutual, absent a breach or other

compelling circumstances, the parties to the agreement may not withdraw or rescind

the agreement based on a mistake.

        In the instant case, neither the government nor Defendant Laskey has

breached the plea agreement.  Rather, the parties made a mutual mistake in

calculating Defendant Laskey's criminal history.   Paragraph 13 of the plea

agreement in this case explicitly states: "Because this agreement is made under Rule

11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not

withdraw any guilty plea or rescind this plea agreement if the court does not follow

the agreements or recommendations herein."

        In fairness, the Government believes that the mistake should be resolved in

Defendant Laskey's favor.  The Court is urged to exercise its considerable

discretion to allow Laskey the benefit of his bargain.  Sentence him as if he were in

 PAGE 20 - GOVERNMENT'S SENTENCING MEMORANDUM

criminal category III because that is the honest but mistaken premise upon which the Government tendered its offer.

## V.    **Victim Monetary Loss**

The amount of the loss to Temple Beth Israel is $896.64.  This represents the amount of money paid to repair the temple's broken windows following the defendants' attack on October 22, 2002.

## VI.  **RECOMMENDATION**

The final offense level of 30 and Criminal History Category IV produces an advisory guideline range of 135 to 168 months imprisonment.  It is understood that Counsel for Defendant Laskey will be submitting a request to the court for a one (1) level downward departure under 18 U.S.C. section 3553(a).  The Government will not object.  A one level downward departure would place Defendant Laskey back in the sentencing range of 121 to 151 months, which was contemplated by the parties when the plea agreement was entered.

All of the above calculations presume that Defendant is deserving of a 3 level reduction for acceptance of responsibility, which is not clear.  The Government requests leave to file a supplemental memorandum addressing that issue.

DATED this  _15th_  day of MARCH, 2007.

Respectfully submitted,

KARIN J. IMMERGUT

PAGE 21 - GOVERNMENT'S SENTENCING MEMORANDUM

United States Attorney


 *William E. Fitzgerald*
WILLIAM E. FITZGERALD
Assistant United States Attorney

PAGE 22 - GOVERNMENT'S SENTENCING MEMORANDUM